# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

PRITCHETT CONTROL, INC.  :
:
:
v.  :  Civil No. CCB-17-2089
:
:
HARTFORD ACCIDENT AND  :
INDEMNITY COMPANY  :

## **MEMORANDUM**

Phase One of the Kirk Bus Modernization project in Baltimore, Maryland, required the procurement and installation of heating, ventilation, and air conditioning automatic temperature controls equipment ("HVAC controls"). This case is about the Maryland Transit Administration's ("MTA") contract ("the general contract") with James W. Ancel, Inc. ("JWA") to complete the modernization project and a subcontract ("the subcontract") between JWA and Pritchett Control, Inc. ("Pritchett"), to carry out the HVAC controls component of the general contract. Pritchett has moved for summary judgment on its only claim, which is a payment bond action under the Maryland Little Miller Act. (Compl. ¶¶ 22-30.) Hartford Accident and Indemnity Company, the defendant in the instant matter and the supplier of the payment bond for the government contract at issue, contends that Pritchett tortiously interfered with the general contract between MTA and JWA, and procured the subcontract between JWA and itself through illegal means.[1] For the reasons explained below, including the lack of sufficient evidence in the voluminous record to indicate that Pritchett interfered with the general contract or procured the subcontract by illegal means, Hartford is liable under the payment bond, and summary judgment will be granted in Pritchett's favor.

---

[1] Hartford levied this charge for the first time in its response to Pritchett's motion for summary judgment.

1

## BACKGROUND

The preamble here is short. MTA drew up highly-detailed design plans for a construction project called Kirk Bus Modernization—Phase 1. (Def's Mem. Opp'n Mot. Summ. J. at p. 3, ECF No. 36.)[2] MTA then solicited fixed-price bids based on its design plans and specifications. One such specification, Section 15900—"HVAC Instrumentation and Controls," specified, among other directives, that "[t]he [HVAC] system shall be an extension of an existing Schneider I/A Series Network 8000 and Enterprise Network Controller system furnished and installed by Pritchett Controls." (Def's Mem. Opp'n Mot. Summ. J., Ex. A, ECF No. 36-1 at p. 3.) It further specified that "[a]ll work described in this section shall be installed, wired, circuit tested and calibrated by factory certified technicians qualified for this work and in the regular employment of the Pritchett Controls – no exceptions." (*Id.* at p. 8.) JWA's bid won and on August 21, 2013, MTA awarded JWA a $41,154,270.00 contract to complete the project. (ECF No. 36 at p. 4.)

As the project got underway, JWA contacted Pritchett to negotiate a price for its work under Section 15900. It is undisputed that Pritchett's price ($820,000) was almost three times the cost of the HVAC estimate provided by the MTA Engineer's Estimate. (James W. Ancel, Sr. Aff. ("Ancel Aff."), Ex. 2, ECF No. 36-3, at p. 12, (Entry 15900)) JWA proceeded to solicit HVAC bids from other subcontractors, who responded with bids that were in the vicinity of the MTA engineer's estimate. (Def's Mem. Opp'n Mot. Summ. J. at p. 5, ECF No. 36.) While the other subcontractors warranted that their HVAC controls system would be compatible with the existing Schneider I/A Series, none of the competing bids were for another Schneider I/A Series system—one, for example, was for an Honeywell System, another for a Johnson Controls

---
[2]All citations will refer to the ECF pagination.

system.³ (*See, e.g.*, Ancel Aff., Ex. 4, ECF 36-3, at p. 16.) JWA further asserts that there were other vendors of Schneider equipment in the Baltimore area at the time, contending that Pritchett misrepresented itself to MTA as the only Schneider supplier. (*See, e.g., id.* at ¶ 13; *see also* Def's Mem. Opp'n Mot. Summ. J. at pp. 13-14, ECF No. 36.) It is unclear from the papers, however, whether Pritchett was the only supplier of Schneider *I/A Series*.⁴ And regardless, this court is in no position to pass on the availability of Schneider I/A Series systems, nor on the merits of the interoperability concerns voiced repeatedly by MTA throughout the record. Suffice it to say there were real or feigned interoperability concerns that led MTA to list Pritchett as the only acceptable supplier of the HVAC controls system.⁵

In the ensuing months, JWA submitted three proposals to MTA for alternative HVAC control systems, all of which were denied. (*See* Def's Mem. Opp'n Mot. Summ. J., Ex. B, ECF No. 36-1 at pp. 35-36.) The thrust of Hartford's collusion, tortious interference, and illegality defenses to paying the bond stem from communications that transpired between Pritchett and MTA during the two-year period between August 21, 2013, when MTA and JWA entered into the general contract, and November 16, 2015, when JWA signed the Pritchett subcontract. Hartford argues that "Pritchett contacted the MTA and worked with the MTA to deny [JWA's] contract right to propose a different product and installer in violation of both State of Maryland procurement law and [JWA's] contract rights." (Def's Mem. Opp'n Mot. Summ. J. at p. 5, ECF No. 36.) To support this allegation, it submits a series of e-mails, chief among them being

---

³ There may also have been potential bids for non-I/A Series Schneider equipment.
⁴ There is a notation on the timeline submitted by Hartford (Def's Mem. Opp'n Mot. Summ. J., Ex. B, ECF No. 36-1 at p. 35) that on January 4, 2012, "Pritchett request[ed] sole sourcing Schneider I/A on CCC upgrade." The exhibit referenced is not contained in the present record. The only evidence in the record on this specific question maintains that Pritchett is the only supplier of the I/A Series in Baltimore at the time of the general contract, the subcontract, and to this day. (Decl. of Benjamin W. Murphy ¶ 4, ECF No. 38; Def's Mem. Opp'n Mot. Summ. J., Ex. M, ECF No. 36-1 at pp. 117-18.)
⁵ Ultimately, the availability of I/A Series systems and the interoperability of the proposed alternatives with the existing system are not necessary to the summary judgment inquiry.

repeated messages between Ba Kalita of Pritchett Controls and Arthur Ives of MTA from the interim period between the general contract and the subcontract in which Mr. Ives assures Pritchett that it will reject competing subcontractor bids, Mr. Ives and MTA employees express frustration with JWA to Pritchett, and Pritchett asks for repeated updates. These communications do not appear free of all impropriety. Indeed, at one point Mr. Ives tells Kalita: "Jimmy is up to something! . . . Keep all of this Very Confidential so I don't get into the 'MUD.'"[6] (Def's Mem. Opp'n Mot. Summ. J., Ex. H, ECF No. 36-1 at p. 100.) Hartford infers from this lengthy communication chain that "Pritchett was clearly communicating with MTA to ensure submittals by [JWA], other than a Pritchett submittal . . . would be rejected" and that "Pritchett

---

[6] In its response, Hartford enumerates the communications it considers most salient to its affirmative defense:

"Mr. Kalita continually sent emails to Mr. Ives with the subject "Checking in" or "Follow up" May 19, 2014; June 30, 2014; July 31, 2014; October 1, 2014; October 24, 2014; December 9, 2014; February 4, 2015; and August 19, 2015. Those emails are attached as Exhibit G.

. . .

March 24, 2014 - Mr. Ives sent Mr. Kalita a memo from Mr. Ives to the MTA's Resident Engineer with Mr. Ives recommendations for denial of the first EASI submittal. (See Exhibit E).

July 10, 2014 – Mr. Ives sent Mr. Kalita an email stating "This problem has gone to the State Legal and they are on OUR SIDE! Ansel is showing himself to be what he is." (See Exhibit G, page 4).

August 15, 2014 – Mr. Ives sent Mr. Kalita an email containing an email chain among MTA personnel about Ancel's request to inspect the existing Schneider controls equipment at the MTA's Bush Street Facility. (Exhibit H).

September 29, 2014 – Mr. Ives sent to Mr. Kalita an internal MTA email with two letters sent by Ancel to MTA regarding a follow up inspection of the existing Schneider controls equipment at the MTA's Bush Street Facility. (Exhibit I).

October 1, 2014 (see Exhibit G, pages 9-13) and October 6, 2014 (Ex. 25), Mr. Ives sent to Mr. Kalita his observations about the follow up inspection at the Bush Street Facility.

November 13, 2014 – Mr. Ives notified Mr. Kalita that the third EASI submittal had been rejected by MTA, exhorting Mr. Kalita to "Hang in there". (See Exhibit G, page 14.)"

(Def's Mem. Opp'n Mot. Summ. J. at p. 8, ECF No. 36.)

4

misrepresented the facts in order to create a sole source environment." (Def's Mem. Opp'n Mot. Summ. J. at pp. 12, 14, ECF No. 36.)

JWA then, perhaps despite itself, entered into a subcontract with Pritchett for the HVAC controls work. Pritchett performed the work and submitted periodic requests for progress payments. (*See* Pl.'s Mem. Mot. Summ. J. at pp. 12-14, ECF No. 31.) Moreover, JWA requested that Pritchett perform additional work to that enumerated in the subcontract, and numerous change orders were executed to that effect. (Pl.'s Mem. Mot. Summ. J. at pp. 14-16, ECF No. 31; Affidavit of Peter Ewart ("Ewart Aff.") Ex. 7-11, ECF No. 32-7 – ECF No. 32-11.) One change order entailed a small deduction in the total subcontract price for work completed by a different subcontractor. (Ewart Aff. ¶ 22, ECF No. 32; Ewart Aff., Ex. 9, ECF No. 32-9.) All told, the subcontract value, with the various additions and deduction(s), totaled $750,397.00. (Pl.'s Mem. Mot. Summ. J. at pp. 30-31, ECF No. 31.)

Pritchett filed the instant motion for summary judgment on March 30, 2018, seeking payment of the outstanding $750,397.00 balance with interest at $123.35 per day. (ECF No. 30.) On April 10, 2018, Hartford raised for the first time, in an amended answer, allegations of tortious wrongdoing by Pritchett and related affirmative defenses to summary judgment. (ECF No. 35.)[7] Hartford filed its response to Pritchett's motion for summary judgment on April 13, 2018. (ECF No. 36.) Pritchett filed its Reply on April 27, 2018. Pritchett's motion for summary judgment is thus ripe for disposition and no hearing is necessary. *See* Local Rule 105.6.

---

[7] Originally, Hartford moved to dismiss pursuant to the doctrine of *forum non conveniens*. (*See* ECF No. 9.) This motion was denied in a memorandum opinion by this court on November 21, 2017. Hartford's motion to extend time to file a responsive pleading, *nunc pro tunc*, however, was granted. (*See* ECF 19.)

5

## ANALYSIS

### I. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

### II. Discussion

*A. Prima Facie Case for Payment Pursuant to Maryland's Little Miller Act*

Pritchett has made a prima facie case for payment under the Hartford surety bond. This is

6

not in dispute.[8] The Maryland Little Miller Act, Md. Code Ann., State Fin. & Proc. §§ 17-101, *et seq.*, requires construction contractors working on behalf of Maryland public agencies to secure a payment bond when the public construction contract exceeds $100,000. Md. Code Ann., State Fin. & Proc. § 17-104(a). The state analog to the federal Miller Act, the statute protects suppliers who furnish material and labor on public construction projects who, but for sovereign immunity, could secure payment using a mechanics lien. *See F. D. Rich Co. v. U. S. for Use of Indus. Lumber Co.*, 417 U.S. 116, 122 (1974); *Allied Bldg. Prod. Corp. v. United Pac. Ins. Co.*, 77 Md. App. 220, 226 (1988). Maryland courts often look to federal court decisions construing the Miller Act when interpreting the Little Miller Act. *Allied Bldg. Prod. Corp.*, 77 Md. App. at 226-27. "The Miller Act is highly remedial (and) entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects[.]" *F. D. Rich Co.*, 417 U.S. at 124. Under the Little Miller Act, a subcontractor is entitled to payment from the surety when it "(1) supplied labor or materials for a contract subject to [the Act] . . . (2) has not been paid in full for the labor or materials within 90 days after the day that the person last supplied labor or materials for which the claim is made . . . [3] [an] action . . . [is] filed within one year after the public body finally accepts the work performed under the contract." Md. Code Ann., State Fin. & Proc. §§ 17-108(a)(1)-(2), 17-109(b); *see also U.S. for Use of Honeywell, Inc. v. A & L Mech. Contractors, Inc.*, 677 F.2d 383, 386 (4th Cir. 1982); *United States ex rel. Warren Painting Co. v. J.C. Boespflug Constr. Co.*, 325 F.2d 54, 62 (9th Cir. 1963) ("[a]ll that is required [to establish a Miller Act Claim] is proof that the labor or material was furnished in the prosecution of the work provided for in the prime

---

[8] It was initially. In its first answer, Hartford argued that Pritchett provided insufficient documentation to support its progress payment requests. (Answer at p. 2, ECF No. 17.) As explained above, Hartford first raised affirmative defenses in its Amended Answer. (ECF No. 35.)

7

contract, and that the subcontractor has not been paid therefor").

Here, the uncontested facts demonstrate that Pritchett's claim meets the requisite test for payment of a surety bond under the Maryland Little Miller Act. First, the parties do not dispute that Pritchett supplied labor and materials for the subcontract and that the subcontract was subject to the Maryland Little Miller Act. Second, it is uncontested that Pritchett has not been paid for the labor and materials it furnished. Third, MTA accepted Pritchett's work on March 15, 2017, and Pritchett's bond payment action was filed on July 25, 2017, well within the one-year deadline. Pritchett has thus made out a viable prima facie claim for payment.

## B. *Hartford's Affirmative Defenses*

The core of the present dispute is over Hartford's newfound affirmative defenses. Hartford alleges that Pritchett interfered with JWA's rights under the general contract and obtained the subcontract through illegal means. It seeks a "setoff by way of recoupment," which is seemingly an effort to render its collusion theory cognizable as a tortious interference claim. In addition, it then contends that the subcontract is not enforceable under contract law because of the allegedly improper communications between Pritchett and MTA. Finally, Hartford argues that the subcontract is not enforceable because Pritchett misrepresented to MTA that it was the sole installer of Schneider equipment and that the contract, which, Hartford says, sole-sourced the HVAC controls work, violated Maryland procurement law.

i. <u>Surety rights under the Maryland Little Miller Act</u>

Whether a surety may rely on a principal's tort claim as a defense to a Maryland Little Miller Act payment bond is a question this court need not reach. Pritchett argues that allowing a surety to offset payment because of a principal's tort claim would countervail the very security

the Little Miller Act was designed to instill. (Reply at p. 5, ECF No. 37.) It relies heavily on *U.S. ex rel. Acoustical Concepts, Inc. v. Travelers Cas. and Sur. Co. of Am.*, 635 F. Supp. 2d 434, 436-37 (E.D. Va. 2009), where summary judgment was granted against the surety despite its attempt to invoke a setoff defense related to a separate non-federal subcontract involving the plaintiff and the principal. "[T]o permit surety reliance on setoff provisions," that court reasoned, "creates the possibility that a subcontractor with substantial, unrelated debts to a general contractor ... could receive *no* payment for furnishing labor and material to a federal project." *Id.* at 441. Hartford, by contrast, invokes the general rule outside the Miller Act context that a surety is not liable unless the principal is liable. *Law of Suretyship and Guaranty* § 7.1, at 200; *Williston on Contracts* § 61:9 (4th ed.). While the alleged debt here is related to the contract backed by the surety, and is thus distinguishable from *Acoustical Concepts*, the court also recognizes that the question is not as straightforward as Hartford would have it. (Little) Miller Act jurisprudence does not import surety-law principles wholesale, and there are conceivable policy reasons why government subcontractors would be differently protected. As explained below, however, even if Hartford is squarely in JWA's position, summary judgment is nevertheless warranted.

ii. Interference Defenses

Whether articulated as tortious interference with the general contract or the acquisition of the subcontract by illegality, Hartford's central thesis is that Pritchett altered JWA's rights in its larger agreement with MTA to complete Phase One of the Kirk Bus Modernization project. As a legal matter, a tortious interference claim requires that the defendant (Pritchett) cause the third party (MTA) to breach its contract with the plaintiff (JWA/Hartford) and the plaintiff thereby

9

incurs damages. *See Fraidin v. Weiztman*, 93 Md. App. 168, 189 (1992). Here, however, Hartford's chief grievance is that the contract was followed to the letter—at least the part directing that the HVAC installation be subcontracted to Pritchett. The contract stated, before any alleged wrongdoing transpired, that the HVAC controls work be performed by "Pritchett Controls—no exceptions." Thus, it is the general contract itself, which JWA knowingly entered into, that is the source of the alleged harm.[9] There is no evidence in the record that Pritchett had any role in drafting or influencing the general contract, apart from the fact that MTA and Pritchett had worked together in the past and that Pritchett had installed the HVAC controls system in the Bush Facility with which MTA wanted to connect the system at issue.[10] It is also unclear whether JWA incurred damages. At the time of filing, JWA had a live forty-five count appeal with the Maryland State Board of Contract Appeals seeking $517,598 in additional payment on the Pritchett subcontract alone. (Reply at pp. 7-8, ECF No. 37; Reply, Ex. B at ¶¶ 94-95, ECF No. 37-2.)

Any separate illegality defense under contract law fails for the same reason. The culprit here, if there is one, is that the general contract was drafted by MTA to effectively sole-source the HVAC controls without following the sole-source provisions of Maryland procurement law. The allegedly nefarious communications between Pritchett and MTA in this case all stem from

---

[9] As explored below, § 1.09 of Specification 15900 does ostensibly permit other pre-bid submissions—but this section conflicts with the rest of Specification 15900 that requires Pritchett to complete the HVAC work.
[10] Hartford also argues that Pritchett misrepresented to MTA that it was the sole supplier of Schneider equipment. Its support for this contention is that Mr. Ives, of MTA, stated that he understood Pritchett to be the "sole supplier and installer of Pritchett system in the area—the Schneider Electric controls in the area[,]" (Ives Tr. 111:19-22, ECF No. 36-1, at p. 117-18.), and that there was a letter (submitted as Exhibit 1 to Defendant's Exhibit M) stating as much. Even if that were enough to support an interference claim, and it is not, the letter submitted is from Schneider Electric and is dated *after* JWA and MTA were under contract. Furthermore, it merely refers to the I/A Series (and one other that is illegible) and does not, counter to Hartford's interpretation, purport to represent that Pritchett is the sole provider of Schneider equipment in the area, generally.

10

the rightful impression that the general contract, by its plain language, required JWA to hire Pritchett to do the HVAC installation. JWA signed the subcontract with Pritchett two years after the general contract was executed, Pritchett completed its work, and JWA asked Pritchett to then perform *additional* work. To now withhold payment by asserting that an initial deficiency in the general contract renders the subcontract illegal would contravene the letter and spirit of the Little Miller Act. *Montgomery County Bd. of Ed. ex rel. Carrier Corp. v. Glassman Constr. Co.*, 245 Md. 192, 201 (1967) (explaining that "[t]he purpose of the bond, based on the statute, is to protect subcontractors and materialmen on State or other public projects where they have no lien on the work done"). It also would disregard Pritchett's justified expectations and likely entail a forfeiture of due compensation. Given that JWA was paid for the HVAC controls work, and that it executed numerous change orders with Pritchett regarding the scope of the subcontract, JWA (and therefore Hartford) also would be estopped from challenging the subcontract's validity. *See Wannamaker v. Edisto Nat'l Bank of Orangeburg*, 62 F.2d 696, 700 (4th Cir. 1933).

Moreover, as a purely factual matter, there is no evidence of collusion or interference with the general contract. There is no evidence in the record that Pritchett had any role in drafting the general contract or had any influence over its terms.[11] There is, instead, significant evidence that MTA was worried about interoperability problems between its existing Pritchett system and the new equipment to be installed, that MTA sought to erect (or maintain) a "campus system," in which MTA's bus facilities in the region all used the same equipment and servicer, (Ives Dep. 133:20-134:12, 54:18-55:19, 61:4-11, 134:14-20, ECF No. 37-4 at pp. 13, 18, 25-26), and that Pritchett was and remains the only provider of the requisite I/A Series system in

---

[11] The only evidence on this question in the record points markedly in the other direction. All MTA employees deposed insist that Pritchett had no role in the decision to use a Schneider I/A Series system. (Ives Dep. 136:22-137:10, 138:18-139:7, ECF 37-4 at pp. 28-30; *see also* Johansen Dep. 132:17-133:1, ECF No. 37-5 at p. 8.; Comfort Dep. 37:19-38:1, ECF No. 37-6 at p. 4.)

Baltimore.[12] Even if there were other I/A Series providers, there are no allegations pertaining to Pritchett's actions prior to the general contract, and the supposedly deleterious communications that transpired between Pritchett and MTA during the period between the general contract and the subcontract were not efforts to deprive JWA of its contract rights; rather they were communications over JWA's recalcitrant attempts to veer from the contract and use non-I/A Series HVAC controls.[13] Read from Pritchett's side moreover, the communications amount to a series of requests for updates on the likelihood that JWA would execute the subcontract.[14] It is Mr. Ives, not Mr. Kalita, who appears in the e-mail communications to be frustrated with JWA and to perhaps, at times, be at risk of over-disclosure; and it was Mr. Ives who appears to have sent Pritchett unsolicited internal MTA documentation. Given the nature and timing of the correspondence, the fact that the general contract specifies work that only Pritchett was equipped to perform, the fact that MTA had used Pritchett in the past for HVAC Controls work and desired a unified system, and the fact that it specifically named Pritchett as its desired (if not required) subcontractor, the supposition that these communications amount to an unlawful attempt by Pritchett to influence MTA cannot be sustained on this record.

JWA (and thus Hartford) may have a legitimate grievance here. The general contract specified that Pritchett must conduct the HVAC controls work, and yet, at the same time, it provided for pre-bid proposals for alternative providers. (Def's Mem. Opp'n Mot. Summ. J., Ex. A, § 1.09.A, ECF No. 36-1 at pp. 9-10.) Section 1.09.A states that "[a]ny installing contractors or

---

[12] Benjamin W. Murphy of Schneider Electric, who wrote the letter Hartford alleges misrepresents Pritchett's status as a sole-source provider of Schneider equipment in the Baltimore region, again warrants, as he did before, that "as of September 2013 and through the present date, no person or company other than Pritchett may furnish, install and maintain the I/A Series and Network 8000 products in Baltimore, Maryland." (Decl. of Benjamin W. Murphy ¶ 4, ECF No. 38.)

[13] It is undisputed that none of the so-called "equal products" JWA submitted were for Schneider Series I/A.

[14] At one point, Kalita asked Ives whether "Ancel is still trying his tricks . . . ." (Def's Mem. Opp'n Mot. Summ. J., Ex. F, ECF No. 36-1 at p. 79.)

manufacturers interested in participating as acceptable bidders for this project that are not pre-qualified shall furnish a detailed technical pre-[general contract] bid submittal to the consulting engineer. All information must be submitted 2 weeks prior to the published bid date to allow the engineer adequate time to review the bidders credentials." (*Id.*) Seemingly diametrically at odds with the "Pritchett only—no exceptions" installation provisions in § 1.04 and § 1.08, one could interpret this clause as MTA trying to have it both ways: forego formally sole-sourcing the HVAC controls while effectively (because of the two-week pre-bid deadline, the language requiring Pritchett to do the installation, and the selection of the I/A Series which, it appears, could be installed only by Pritchett) limiting potential subcontracts to Pritchett alone.[15]

Under Maryland procurement law, a State agency may sole-source a product if it abides by the prescriptions of State Finance & Procurement Article § 13-107, which, among other requirements, mandates that the procurement officer determine there is "only 1 available source for the subject" and that approval be received by the head of the unit. State Finance & Procurement Article § 13-107. If a product is not sole-sourced, however, "[i]t is the policy of the State that specifications be written so as to permit maximum practicable competition without

---

[15] *See* Procurement Officer's Decision, Reply, Ex. H at p. 5, ECF 37-8, (explaining "[t]he basis of MTA's rejections is that JWA did not submit the [Building Management System (part of the HVAC system)] equipment manufacturer specified by Section 15900, Schneider Electric, and the pre-qualified installer specified by Section 15900, Pritchett Controls. . . . As discussed above . . . JWA contends that the Contract does not and cannot require JWA to provide BMS equipment manufactured by Schneider Electric and to have that equipment installed [*sic*] Pritchett Controls.
. . .
The requirements of Contract Section 15900 make the MTA's intentions clear. MTA has converted the control of HVAC operations of its bus maintenance facilities to a "campus" system where HVAC operations are controlled from a central location, MTA's Bush facility. [JWA contends that the Bush facility itself does not use I/A Series. But again, the actual nature of the equipment and its interoperability is irrelevant to the present question. It is the contract language, and what MTA purported to require before Pritchett entered the picture that is relevant here.] In order for a campus BMS to function, the equipment in all locations, such as the new Kirk Bus Maintenance Building, must be compatible and be able to digitally intercommunicate. The BMS equipment installed in the other MTA bus facilities is manufactured by Schneider Electric, and maintained by Pritchett Controls. Nevertheless, MTA provided bidders the opportunity to pre-bid to propose alternative manufacturers and contractors. However, JWA made no pre-bid submittal as provided for in Section 15900 for alternative BMS equipment manufacturer or installer."

13

modifying the State's requirements. Specifications may not be drawn in such a manner as to favor a single vendor over other vendors." Code of Maryland Regulations (COMAR) 21.04.01.02.A. Here, it is undisputed that MTA did not sole-source the HVAC controls work pursuant to § 13-107. Furthermore, the general contract, by its plain terms, was not written to permit maximum practicable competition, indeed it forestalls competition. While it purports to provide for pre-bid alternatives, the timeline for the general contractor to propose equal alternatives is so constricted as to effectively prevent competition altogether. Specification 15900 may well have been drawn to favor a single vendor in violation of COMAR 21.04.01.02.A. Indeed, this is the subject of JWA's appeal to the MSBCA. (*See* Reply, Ex. B at ¶¶ 77-95, ECF No. 37.)

And yet, here too, Pritchett is not the offender. Hartford argues that "[t]he violation of state procurement law arising from the conduct by Pritchett was . . . [an] attempt to circumvent State law regarding sole source procurement." But this is just not so. The record is devoid of any allegation that Pritchett had a role in drafting the general contract. If anything, it was MTA's decision to sole-source the HVAC controls installation, constructively if not as a formal matter, that pushed JWA into its asserted double-bind. Pritchett's actions and communications in this case individually and collectively, even when read at every juncture in Hartford's favor, do not warrant withholding the payment bond for work subcontracted and completed long after JWA was well-aware of its grievances with MTA over the general contract and Specification 15900. Pritchett is therefore entitled to summary judgment on its payment bond claim in the form of $750,397.00 plus interest at the rate of $123.35 per day.

A separate order follows.

1/10/19  
Date

_____
Catherine C. Blake
United States District Judge